Mr. Justice Clifford
delivered tbe opinion of tbe court, botb in tbe appeal by Reed and tbe cross appeal by tbe United States.
I. In the appeal.
Affreightment contracts are of two kinds, and they differ from each other very widely in their nature as well as in their terms and legal effect. Charterers or freighters may become tbe owners of tbe voyage without any sale or purchase of tbo ship, as in cases where they hire tbe ship and have by the terms of tbe contract, and assume in "fact, tbo exclusive possession, command, and navigation of the vessel for the stipulated voyage. But where the general owner retains tbe possession, command, and navigation of tbe ship, and contracts for as pecified voyage, as, for example, to carry a cargo from one port to another, the arrangement in contemplation of law is a mere affreightment sounding in contract and not a demise of the vessel, and tbe charterer or freighter is not clothed with tbe character or legal responsibility of ownership. (Donahoe v. Kettell, 1 Clifford, 137; The Volunteer, 1 Sumner, 551; The Spartan, Ware, 153; Gracie v. Palmer, 8 Wheaton, 605 ; Clarkson v. Edes, 4 Cowan, 470; Taggard v. Loring, 16 Massachusetts, 336; Christie v. Lewis, 2 Broderip & Bingham, 410.) Unless the ship herself is let to hire, and tho owner parts with the possession, command, and navigation of the same, the charterer or freighter is not to be regarded as the owner for the voyage, as the master, while the *197 owner retains the possession, command, and navigation of tbe ship, is the agent of the general owner and the mariners are regarded as in his employment, and he is responsible for their conduct. (Putnam v. Wood, 3 Massachusetts, 481.) Courts of justice are not inclined to regard the contract as a demise of the ship if the end in view can eonvenienly be accomplished without the transfer of the vessel to the charterer, but where the vessel herself is demised or let to hire, and the general owner parts with the possession, command, and navigation of the ship, the hirer becomes the owner during the term of the contract, and if need be he may appoint the master and ship the mariners, and he becomes responsible for their acts. (Sherman v. Fream, 30 Barbour, 478; Reeve v. Davis, 1 Adolphus & Ellis, 312; Frazer v. Marsh, 13 East., 238; Marcardier v. Chesapeake Insurance Company, 8 Cranch, 39; 1 Parsons on Shipping, 278; Campbell v. Perkins, 4 Selden, 430.) On the first day of June, 18C5, the assistant quartermaster of the United States stationed at Saint Louis applied to the plaintiffs, as the owners of the steamboat Belle Peoria, to transport a cargo of military supplies from that port to Fort Berthold, but the owners of the steamboat declined on account of the lateness of the season. He then ordered them to prepare for the trip, and informed them that in case of refusal the steamboat would be impressed. They protested, but under the orders given got the boat in readiness, put the cargo on board, and on the 3d of June, 1865, left Saint Louis for the place of destination, where the steamboat arrived on the 22d of July following, when she discharged her cargo, and on the 24th of the same month started down the river on her return trip. She proceeded for two days in safety, when a high wind “ sprung up,” and in attempting to land she was blown ashore and grounded. All efforts to get her off proved unavailing, and believing it impossible to do so until a rise should occur'in the river, the master, most of the other officers, and crew decided to return, leaving on board the mate, one engineer, and three watchmen to take care of the boat, aided by a military guard detailed and sent from Fort Rice by the officer in command at that post. Information that the steamboat was aground reached the owners at Saint Louis, on the 10th of August, 1865, but she remained aground until the 15th of April of the next year, when she was swept off by an ice-freshet in the river and totally destroyed. When the assistant *198 quartermaster ordered tbe owners to prepare for the trip he fixed the per diem compensation of the boat at $272, which appears to hare been satisfactory to the owners, as they were paid at that rate to the time they received information of the disaster, and they have presented no claim for any greater allowance for that period of time. They were also paid at the rate of $101. per day from the said 10th of August, to the 30th of September in the same year, covering the period, as stated in the finding, that the mate, engineer, and the three watchmen remained on board after the master and the rest of the officers and crew returned. Vouchers were also issued to the plaintiffs at the rate of $80 per day from the 30th of September of the same year to the 30fch of November following, but those vouchers have never been paid or recognized, and the plaintiffs sued the United States for the amount of those vouchers and for compensation for the use of the steamboat at the same rate from the time the last voucher was issued to the time when the steamboat was swept off from the place where she was grounded by the ice-freshet in the river, and totally destroyed.
Although the plaintiff's objected to the order of the quartermaster at the time it was given, still it is quite evident that they ultimately consented to perform the service as matter of contract, and that they were content to receive the per diem compensation fixed by the assistant quartermaster at the time lie gave the order. Abundant confirmation of that view is found, if any be needed, in the fact that they voluntarily accepted the prescribed per diem compensation from the commencement of the trip to the 10th of August following, -when they received information of the disaster, which was at the time when the master and all the steamboat’s company, except the mate, one engineer, and three watchmen, returned to the port of departure, and that the plaintiffs make no claim for any additional compensation during that period. Compulsion is not set up by the plaintiffs, and, if it was, the theory could not bo supported, as the jurisdiction of the Court of Claims does not extend to torts. They have also been paid for the value of the steamboat, and also a per diem compensation of $101 per day, from the 10th of August to the 30th of September, -which is the date when the mate, engineer, and the three-watchmen also left the steamboat and returned to St. Louis. *199 No additional compensation is claimed for that period, bat they ■claim for the amount of the vouchers issued at the rate of $80 per day for the two months next succeeding that period, and .at the same rate from the end of that period to the 15th of April in the following year, when the steamboat was swept off by the ice-freshet and was totally destroyed. Judgment was rendered for the claimants for certain moneys, not involved in this appeal, which were expended by them in efforts to save the°steamboat; but the petition, so far as respects the per diem -compensation, was dismissed, and the claimants appealed to this court.
Throughout the litigation the plaintiffs have prosecuted their claim as a matter of contract, and it is quite clear that it could have no other foundation in the court where the suit was brought, and of course it must depend upon the proper application of the principles of commercial law to the facts of the ■case as found by the Court of Claims.
By the terms of the contract, they were to carry the cargo of military supplies from the port of Saint Louis up the Missouri River to Fort Berthold for $272 per day during the voyage, including the return trip as well as the trip to the place of destination, in full compensation for the entire service. By necessary implication the plaintiffs were to victual and man the steamboat and keep her in a seaworthy condition, and in contemplation of law they retained the possession, control, and navigation of the steamboat, as the master was one of their own selection and the crew were in their own employment, and they were responsible for their conduct. Steamers require fuel as a means of creating motive-power, and it is quite obvious that it was the duty of the plaintiffs to supply the steamboat ■with fuel for that purpose as well as provisions for the officers and crew, and that the master was their agent and not the agent of the charterers. Well-founded doubts cannot be entertained upon that subject, and if those conclusions of fact are correct, then it follows as a conclusion of law that the plaintiffs, .as the general owners of the steamboat, were also the owners for the voyage, and that the true relation of the United States to the adventure was that of a charterer for hire and shipper of the cargo. (Saville vs. Campion, 2 Barnewall & Alderson, 510.) Through the assistant quartermaster at Saint Louis the United States put the cargo on board the steamboat, at a fixed *200 per diem compensation during the round trip, for transporting-the military supplies constituting the cargo to the place of destination, the steamboat having the right to take a return cargo from other shippers or to return in ballast, at the election of her owners. She performed the trip up the river, and delivered the cargo in good condition and started on the return trip, the United States, as the charterers, having no further interest in the voyage except that the steamboat should return to the port of-departure without delay. All sea risks were un- ' questionably upon the owners of the steamboat, as they were-the owners for the voyage as well as the owners in fact, and the record shows that they must have so understood their own rights, as the statement in the record is that when they received-information of the disaster “ they made their protest in order to cover the insurance.”
Suggestion ma.y be made that the act of the United States in paying for the value of the steamboat after she was swept off by the ice-freshet and destroyed is inconsistent with the theory that they were merely the charterers for hire, and that the-plaintiffs were the owners for the voyage as well as the owners in fact; but the adjudication of the Third Auditor cannot change the rights of the parties in respect to any matters not within his jurisdiction. (9 Stat. L., 415.) Whether that adjudication was correct or incorrect is not a question in this case, and it is only referred to as showing that it cannot have any weight in the decision of the case before the court. Freight, it is said, cannot be earned unless the voyage is performed and the cargo is delivered; but the voyage in this case, so far as respects the cargo, was performed, and the cargo-was duly delivered to the consignees, and to that extent the freight was earned; but the plaintiffs were entitled, under the contract, to the same per diem compensation during the return trip in case it was performed without unnecessary delay, and it may be that the United States could not have claimed any deduction from the agreed compensation if the interruption in the voyage had been only a temporary one, and the master,, when the cause of interruption had been removed or overcome, had proceeded with the steamboat to the return port. .
Whatever repairs. became necessary in consequence of the-disaster would have been a charge to the steamboat or her-owners; but it maybe that the plaintiffs would have been en *201 titled to the agreed compensation for the days spent in executing the repairs as well as for the days actually spent iu the return trip; but it is not necessary,to decide those questions in this case, and the court does not express any decided opinion upon the subject. (Abbott on Shipping, 43; Hawkins v. Twizell, 5 Ellis & Blackburn, 683; Havelock v. Geddes, 10 East., 555.) But the interruption in the voyage was not merely a temporary one in any proper sense of the term. On the contrary, the voyage was completely broken up, as fully appears from the fact that the master and all the crew ultimately abandoned the steamboat, leaving her where she was stranded, and that she remained there until the 15th of April of the next year, when she was swept off by the ice-freshet and became a total loss. Broken up, as the voyage was, by the perils of navigation, no doubt is entertained that the plaintiffs were entitled to the agreed per diem compensation to that time, and to such further allowance at the same rate and for such additional time as it would have required for the steamboat to have completed the return trip. They had performed the whole of the stipulated service for the United States and had delivered the cargo to the assignees and were proceeding on the return trip in good faith, when the voyage was broken up by causes beyond their control and without any fault on their part or on the part of the master or crew. Unless a carrier assumes the risk of all contingencies, he is not liable because he fails to perform what is rendered impossible by the perils of the sea. Such events as are known as the accidents of major force, or fortuitous events, or the acts of God, always constitute an implied condition in every such engagement. (The Eliza, Davies’s Admiralty, 318.) Neither party is at liberty to abandon the contract without the consent of the other, or icithout legal cause, and such cause must not be one procured or occasioned by the fault of the party who relies upon it. (Clark v. Insurance Company, 2 Pickering, 108.) Different views have been expressed by different courts as to the effect of a temporary interruption of a voyage upon the rights of the owner of the ship and the shipper or charterer; but the rule seems to be well settled, that when the voyage is broken up by a sea peril, neither the shipper nor the charterer is iu general liable to the ship-owner beyond the time when the peril occurred; but that rule is more particularly applicable, iu cases ivhere the transportation of *202 the cargo is not complete, and it cannot be applied at all to the ca'so before the court without considerable qualification. (Palmer v. Lorillard, 16 Johnson, 352.) Reasonably construed, the contract gives the plaintiffs the agreed per diem compensation from the commencement of the voyage until the same was broken up, including also so many days in addition as would have been spent, if no disaster had occurred, in completing the return trip. Apply that rule to the case, and it is clear that the judgment of the court below must be affirmed, as the United States, upon the most liberal computation, have paid ¡more than the contract would entitle the plaintiffs to demand. Payment was made to the time when the mate, engineer, and three watchmen returned home, and the plaintiffs have no right to claim anything more.
Judgment affirmed.
II. — In the cross appeal.
Supplies for the military service were transported by the appellees from Saint Louis, up the Missouri River to Fort Berthold, •as more fully explained by the court in the case first decided. They were the owners of the steamboat Belle Peoria, and it appears by the findings in the court below, that the assistant quartermaster at that station, on the 1st day of June, 1805, applied to them to take such a cargo, and transport it to that place. Objections were made by the owners of the steamboat, as explained in the preceding case; but they put the cargo on board, and on the 3d of the same month started on the upward trip, and it appears that they made the trip in safety, ■delivered the cargo to the consignees, and without any unnecessary delay started on the return trip. Two days after they started •on the return trip the steamboat encountered a high wind, and while those in charge of her were endeavoring to land, she was blown aground, and became fast. All efforts to get her off proving unavailing, the officers and crew, except the mate, one •engineer, and three watchmen, left her and returned to the port of departure. By the findings, it appears that the mate, ■one engineer, and three watchmen remained on board to the •30th of September of the same year, when they also left the steamer and returned.
Claim was made by the present appellees, in the case first •decided for compensation for the service performed in addition *203 to wbat they bad reeeisTed; but it is unnecessary to enter into anj'- of those details, except to say that the boat remained aground until the 15th of April of the following year, when she was swept off by an ice-freshet, and was totally destroyed. Before that occurred, however, the owners of the steamboat dispatched a pilot and crew up the river to the place where the steamboat was aground, to get her afloat and bring her down the river, but the steamboat had been swept off and destroyed three days before they arrived at the place of the disaster. Expenses, of course, were incurred for the wages of the pilot and crew, and for provisions and transportation, and the court below found that those expenses amounted to the sum of $2,500, and for that sum the Court of Claims rendered judgment for the appellees, and the United States appealed to this court.
Apart from what appears in the opinion delivered in the other appeal, the only facts found by the court below in sup-2)ort of the claim are what is exhibited in the following statement: ‘‘These persons, meaning the pilot and crew, were sent, after consultation with the quartermaster at Saint Louis, and for the purpose of protecting the interests of the United States, as well as those of the claimants.” Unless the United States, in contemplation of law, were the owners of the steamboat for the voyage, they had no property interests in the stranded steamboat, as the cargo had, two days before the disaster occurred, been safely discharged at the place of destination and duly delivered to the consignees. They were not owners for the voyage, as the court has just decided, so that if the statement is founded on that theory, it is error, and entitled to no weight; and if not founded on that theory, it does not appear to rest on any substantial foundation, as the court has decided in the other appeal that the appellees, as the general owners and owners for the voyage, assumed all risks from sea perils for the entire trip.
Temporary delays, if any had occurred, might have increased the per diem compensation which the United States had promised to pay; but the voyage had been brollen up and frustrated, more than six months before the pilot and crew were sent to the place of the disaster, for the purpose of getting the steamboat afloat. Suppose, however, that it could be admitted that the United States had some property interests in the steamboat, still the admission would not benefit the appellees, *204 as it is perfectly clear that the assistant quartermaster had no authority to bind the United States in any such arrangement. He did not attempt to make any contract, and nothing of the kind can be inferred from the finding of the court, even if it be competent for this court to make inferences to support the judgment, which is not admitted. All that is found, is, that the owners of the steamboat consulted with the quartermaster before they dispatched the pilot and crew to the scene of the disaster, which falls very far short of evidence to prove a contract, even if the quartermaster had been invested with authority for any such purpose. Viewed in any light, the record does not show any legal foundation'for the judgment.
Judgment reversed, and the cause remanded with directions to dismiss the petition.